Filed 10/18/23  P. v. Caldera CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHELLE ESTELLE CALDERA,<br><br>    Defendant and Appellant. | B321779<br><br>Los Angeles County<br>Super. Ct. No. VA120392 |

APPEAL from an order of the Superior Court of Los Angeles County, Raul Anthony Sahagun, Judge. Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In 2014, a jury convicted appellant Michelle Estelle Caldera of premeditated attempted murder on a direct aiding and abetting theory. The jury was not instructed on the natural and probable consequences doctrine or the felony murder rule. In 2022, Caldera filed a petition for resentencing under Penal Code[1] section 1170.95 (now § 1172.6)[2] in which she argued that the jury convicted her of attempted murder under an invalid imputed malice theory of liability. The trial court summarily denied the petition and Caldera appeals. We conclude the jury instructions did not permit the jury to find Caldera guilty of attempted premediated murder without also finding that she personally acted with the intent to kill, and that Caldera was therefore ineligible for resentencing as a matter of law. We therefore affirm.

## FACTUAL BACKGROUND

Our summary of the underlying facts is taken from the unpublished opinion in *People v. Lerma and Caldera* (Sept. 16, 2015, B256152).

Gloria Montes and Arthur Peter Lerma were both members of the Pico Nuevo criminal street gang. Caldera belonged to Whittier Varrio Locos, a gang "on pretty good terms" with Pico

---

[1] All undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change to the text (Stats. 2022, ch. 58, § 10). We refer to the statute interchangeably as section 1172.6 and section 1170.95 depending on the context.

Nuevo. The three had been friends growing up, and Montes and Caldera were best friends.

Lerma's relationship with Montes soured in 2003 when he was convicted of the robbery of two Gigante Market customers in Pico Rivera. Montes was questioned during the robbery investigation and told police that she had gone to Gigante Market with Lerma to use an ATM. In the store were two men, one of whom was African American. Lerma asked Montes, " 'What is that nigger doing here? Doesn't he know this is Pico Nuevo?' " Lerma then approached the men and repeated his question, but Montes did not see him rob anyone.

Lerma was ultimately convicted of the robbery and sentenced to eight years in prison. While in prison, he sent Montes a threatening letter, telling her that "he was going to come and get her" because she was a snitch and a rat. The letter was never recovered. Montes never saw him again.

In early May 2011, while Lerma was on parole for the robbery, he paid a visit to Jose Trejo, a Pico Nuevo shot-caller in charge of about 100 other gang members. Visiting Trejo was an opportunity for Lerma to make a case to gang leadership that despite his lengthy incarceration, he could still be valuable to Pico Nuevo. Shooting Montes in front of Trejo would be another way for Lerma to reestablish power in the gang and prove that he could be an asset.

The evening of May 18, 2011, someone rented a small motel room at the Knights Inn to use as the venue for a "hood party"—a gathering at which gang members and their friends assembled to take drugs together. Each of the eight to 15 party guests was connected in some way to Pico Nuevo. For example, Trejo was a "shot-caller" or mid-level gang leader, Tish Sanchez had a son in

the gang, Lerma was on parole for a Pico Nuevo crime, and Caldera belonged to an allied gang.

Sanchez and Caldera arrived first. They pulled up in Sanchez's white Nissan Altima, which sported fancy rims. Trejo was dropped off by some friends. Most of the people in the room were strangers to Trejo, though he later identified Caldera and Lerma.

All of the party guests smoked methamphetamine that evening; others, such as Trejo, also drank alcohol and smoked marijuana. During the party, Caldera and Lerma were seen talking to each other—either secretively or romantically. At some point, Sanchez saw Caldera holding a cloth gun case.

Eventually, Trejo grew restless and began looking for a ride to another party; Caldera offered to drive him in Sanchez's car. Sanchez rejected this plan—she didn't trust Caldera with her car—but ultimately agreed to let Lerma borrow it for 15 minutes to pick up his girlfriend. She left the key on the counter for him.

Just after 1:00 a.m., Lerma and Caldera left the Knights Inn with Trejo. Caldera drove Sanchez's Nissan. Lerma rode in the front passenger seat, and Trejo sat in the back. Unbeknownst to them, the Los Angeles Sheriff's Department had placed a GPS tracking device on Sanchez's car the week before as part of an investigation into her activities.

At 1:07 a.m., Caldera stopped the car on a street near Montes's apartment. She retrieved a cloth-wrapped item from beneath her seat and handed it to Lerma. They did not speak to each other over the loud music, but Lerma put the item in his pocket. Lerma and Trejo got out of the car and walked down a nearby alley, towards Montes's apartment.

Montes shared her small bedroom with Vicky Gollette, who is partially blind. The women slept in separate twin beds. The bedroom window faced the alley, and Montes kept it open to the night air. Montes slept beside the window, and Gollette slept next to the door.

The men approached Montes's window. Lerma looked inside while Trejo stood nearby. Lerma called, "Go–Go," twice through the screen. As soon as the sleeping Montes mumbled a response, Lerma shot her in the head. Then he paused, fiddled with the gun, and fired two or three more shots.

Trejo took off running. Lerma caught up to him at a chain-link fence, and told him if he did not "keep [his] mouth shut," Lerma would "smoke [him]." After delivering this warning, Lerma ran back to the waiting car. Caldera and Lerma drove off in the Nissan at 1:10 a.m.

Montes's neighbors heard the shots and called 911. Emergency dispatch began receiving calls at 1:11 a.m., and sheriff's deputies arrived within minutes. They found Montes in her bedroom, laying on her bed. She had been shot in the right temple, but was moving slightly and making a gurgling noise.

The forensic evidence supported the witness accounts. Police found holes in the screen, blinds, and wall, and a spent bullet in the neighboring apartment; the trajectory of the bullets established that they were fired through the bedroom window and down towards the bed. Though the gun used in the shooting was never recovered, criminalist Manuel Munoz testified the bullets were fired from the same weapon—probably a .38 special, or a .357 magnum revolver, based on the spent bullets and bullet fragments recovered from the scene, and lack of shell casings.

The record does not reveal where the Nissan went, or what Lerma and Caldera did, for the hour following the shooting. However, at 2:13 a.m., Caldera and Lerma arrived at the Colmenero home in nearby Whittier. Melissa and Amie Colmenero were close friends with Caldera, but barely knew Lerma. Melissa later told authorities that she overheard Caldera tell Amie, " 'we just did a jale' "—a gang job. The Nissan remained at the Colmenero home until 2:24 a.m. It was returned to the Knights Inn soon thereafter.

A few days later, Lerma called Trejo and reminded him to "keep [his] mouth shut." Around the same time, someone told Sanchez to get rid of her car. She was furious, but took it to an auto body shop to have its distinctive rims removed. She also swapped the license plate for a new one.

Montes survived the shooting but was critically injured. The shot injured the right side of her brain, which paralyzed the left side of her body, and blinded her in one eye. Montes wore a helmet in court because she was missing a palm-sized section of the back of her skull. Doctors were unable to save her right ear; they removed it entirely and sewed the opening shut.

After four months in the hospital, Montes was released in September 2011. Though she was able to testify at the preliminary hearing in the summer of 2012, during the following year and a half, Montes took a turn for the worse and slipped into a vegetative state. The parties stipulated to her unavailability, and her preliminary hearing testimony was read at trial.

## PROCEDURAL BACKGROUND

In an information dated August 2012, the Los Angeles County District Attorney charged Caldera with attempted murder (§ 664/187, subd. (a)) and possession of a firearm by a felon (§ 12021, subd. (a)(1))[3].

At trial, the jury was not instructed on a natural and probable consequences theory or felony murder, but on direct aiding and abetting. The court read the jury CALCRIM No. 400, which states: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

The court also instructed the jury with CALCRIM No. 401, which states, in part: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the

---

[3] The Deadly Weapons Recodification Act of 2010 repealed and recodified former sections 12000 to 12809 without substantive change. (§§ 16000, 16005, 16010.) Former section 12021 was recodified without substantive change at section 29800, operative January 1, 2012. (Stats. 2010, ch. 711 (S.B. 1080), § 4 [repealed]; *id.*, § 6 [reenacted].)

perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."

The court also read the jury CALCRIM Nos. 600 and 601 with respect to attempted murder and deliberate and premeditated attempted murder, respectively. CALCRIM No. 600 states in part: "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." CALCRIM No. 601 provides in part: "If you find the defendant guilty of attempted murder under Count One, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. [¶] The defendant acted willfully if he or she intended to kill when he or she acted. The defendant deliberated if he or she carefully weighed the considerations for and against his or her choice and, knowing the consequences, decided to kill. The defendant premeditated if he or she decided to kill before acting."

In April 2014, a jury convicted Caldera of both counts. The jury also found true the allegations: (1) that the attempted murder was willful, deliberate, and premeditated; (2) that a principal personally and intentionally discharged a firearm which caused great bodily injury to Montes; and (3) that the attempted murder was committed for the benefit, at the direction of, and in association with a criminal street gang with the specific intent to

8

promote, further, and assist in conduct by gang members. In May 2014, the court sentenced Caldera to 32 years to life.

On direct appeal, this division modified the judgment to impose required assessments and fees on Caldera and affirmed the modified judgment.

In January 2022, Caldera filed a petition for resentencing under section 1172.6. The People opposed the petition on the ground that Caldera was not convicted of attempted murder under a natural and probable consequences theory of culpability.

The court appointed counsel for Caldera and set a hearing to determine whether Caldera had made a prima facie case for relief. In her reply brief, Caldera argued that CALCRIM No. 401 could allow the jury to conclude that Caldera was guilty without the required mens rea for attempted murder. Caldera cited *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), in which the court held that the absence of any instruction concerning the natural and probable consequences theory did not preclude a prima facie showing for relief under section 1172.6.

At the prima facie hearing, counsel for Caldera conceded that she was convicted under a straight aiding and abetting theory and not under a natural and probable consequences theory. The court observed that, in *Langi*, the defendant could have been convicted on an implied malice theory. The court distinguished *Langi* with *People v. Coley* (2022) 77 Cal.App.5th 539 (*Coley*), which it cited for the proposition that, if the defendant is found guilty of a crime requiring express malice or an intent to kill, such as attempted murder, she is not entitled to relief under section 1172.6. After considering the jury instructions, the court concluded that "there is no doubt that

9

[Caldera] was convicted on an express malice theory." The court therefore denied Caldera's petition.

## DISCUSSION

Caldera, citing *Langi*, argues the fact that the jury did not receive a natural and probable consequences theory instruction does not render her ineligible for relief under section 1172.6. She contends that the instructions "left room for doubt" as to whether the jurors would have understood whether Caldera had to personally harbor an intent to kill.

The Attorney General argues that the absence of a natural and probable consequences theory instruction is determinative and the trial court's order should be affirmed on that basis alone. The Attorney General further asserts that Caldera's premeditated attempted murder conviction demonstrates that the jury found that she acted with express malice. We affirm.

1. **Caldera failed as a matter of law to establish a prima facie case for resentencing.**

   1.1. **Applicable Law**

As amended by Senate Bill No. 775 (SB 775), section 1172.6, subdivision (a) provides: "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, *attempted murder under the natural and probable consequences doctrine*, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." (Italics added.)

An offender must file a petition in the sentencing court averring that: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[;] [¶] [and] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)–(3); see also *id.*, subd. (b)(1)(A).) Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel." (*Id.*, subd. (b)(1)(C).)

"Upon receiving a petition in which the information required by this subdivision is set forth or a petition where any missing information can readily be ascertained by the court, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1172.6, subd. (b)(3).) The prosecutor shall file a response within 60 days of the service of the petition, and the petitioner may file a reply within 30 days of the response. (*Id.*, subd. (c).) When briefing has been completed, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (*Ibid.*) "If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (*Ibid.*)

11

In determining whether a petitioner has made a prima facie showing of entitlement to relief, the trial court's inquiry will necessarily be informed by the record of conviction, which will facilitate the court in distinguishing "petitions with potential merit from those that are clearly meritless." (*People v. Lewis* (2021) 11 Cal.5th 952, 971.) This includes the jury instructions, which are part of the record of conviction, because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion,'" which must wait to occur until after an order to show cause issues. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, disapproved on another ground in *Lewis*.) The court is prohibited from engaging in " 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis*, at p. 972.) Rather, the court must " ' "take[ ] [the] petitioner's factual allegations as true" ' " and make a " ' "preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved." ' " (*Id*. at p. 971.) Summary denial of the petition is appropriate where the record of conviction establishes the petitioner is ineligible for resentencing as a matter of law. (*People v. Estrada* (2022) 77 Cal.App.5th 941, 945; *Coley*, *supra*, 77 Cal.App.5th at p. 548.)

Because the trial court's denial of Caldera's petition without issuing an order to show cause is a purely legal conclusion, we review it de novo. (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251.)

### 1.1.1. *Langi* and *Coley*

*Langi* and *Coley* feature prominently both in the court's reasoning below and the parties' briefing on the issue of whether a prima facie case may be established in the absence of any natural and probable consequences theory or felony murder instructions.

In *Langi*, *supra*, 73 Cal.App.5th 972, a division of the First District held that a defendant is entitled to an evidentiary hearing on the merits of the section 1172.6 petition where the jury instructions given at trial permitted the jury to convict the defendant under a theory of imputed malice, even in the absence of any instructions concerning the natural and probable consequences doctrine. Langi was part of a group of four who punched, kicked, and robbed the victim. During the attack, the victim fell, striking his head, which led to his death. (*Langi*, at p. 975.) The jury was instructed using the standard CALJIC instructions on first degree felony murder, implied malice, and direct aiding and abetting, but not on the natural and probable consequences theory. (*Id.* at p. 981.) The jury acquitted Langi of first degree felony murder but convicted him of second degree murder, robbery and battery. (*Id.* at p. 977.) Langi filed a petition for resentencing, which the trial court summarily denied. (*Ibid.*) During the pendency of the appeal, SB 775 was passed.

The *Langi* court reversed and ordered an evidentiary hearing on the merits of the section 1172.6 petition. (*Langi*, *supra*, 73 Cal.App.5th at p. 976.) Even without explicit instruction on the natural and probable consequences theory, the court found that the record of conviction did not conclusively exclude the possibility that Langi was convicted under SB 775's newly added imputed malice theory. (*Id.* at p. 976.) The court

13

recognized the CALJIC instructions for aiding and abetting an implied malice murder did not adequately explain the mens rea required for implied malice murder liability. "Although the definition of second degree murder in CALJIC No. 8.31 states that the perpetrator must have acted with conscious disregard for human life, the definition of an aider and abettor in CALJIC No. 3.01 does not include the same requirement." (*Id*. at p. 983.)

The court concluded that this instructional imprecision allowed the jury to find Langi "guilty of aiding and abetting second degree murder" by imputing malice based solely on Langi's participation in a crime, "without finding that he personally acted with malice." (*Langi, supra*, 73 Cal.App.5th at p. 982.) The court explained that "[t]he aiding-and-abetting instruction stated that a person aids and abets a crime if he or she acts '*with knowledge of the unlawful purpose of the perpetrator*, and . . . with the intent or purpose of committing or encouraging or facilitating the commission of the crime.' [Citation.] However, . . . the second-degree-murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death. Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' [citation], his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Id*. at pp. 982–983.)

14

The court in *Langi* concluded that such a record of conviction did not support summarily denying a section 1172.6 petition at the prima facie stage because it did "not conclusively negate the possibility that the jury found appellant guilty of second degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted" with implied malice. (*Langi*, *supra*, 73 Cal.App.5th at p. 984.)

In *Coley*, *supra*, 77 Cal.App.5th 539, a different division of the First District distinguished *Langi* from the circumstances before it. The defendant in *Coley* was convicted of both second degree murder and attempted murder and appealed the summary denial of his petition for resentencing under section 1172.6. (*Coley*, at pp. 541–542.) The trial court concluded that the record of conviction showed the jury had found express malice, i.e., a specific intent to unlawfully kill, when it convicted appellant of attempted murder, and therefore denied the petition. (*Id*. at p. 545.) The Court of Appeal affirmed. With respect to second degree murder, the court concluded that the "appellant's conviction for attempted murder demonstrates that he was convicted of second degree murder with express rather than implied malice" and that "*Langi* does not apply because that case involves *implied* malice." (*Id*. at p. 547.) The court explained that "appellant was convicted of murder based on his aiding and abetting of the same shooting that gave rise to the attempted murder conviction" and that "[t]he jury was instructed by CALCRIM No. 600 that attempted murder requires a determination that 'the defendants intended to kill that person.' " (*Ibid*.) "[B]y finding appellant guilty of attempted murder, the jury necessarily found he had personally harbored intent to kill

15

or express malice when he aided and abetted the second degree murder." (*Ibid.*)

With respect to the attempted murder conviction, the court observed that "[s]ection 1170.95 applies by its terms only to attempted murders based on the natural and probable consequences doctrine" and the jury was not instructed on that doctrine. (*Coley, supra,* 77 Cal.App.5th at p. 548.) Thus, "[t]he court was not required to grant resentencing on this count." (*Ibid.*)

### 1.2.  Analysis

Caldera first contends that the court erred in summarily denying her petition because she checked all the required boxes on her form petition. Caldera does not address the authority establishing that a court is not limited to the petition in determining whether a prima facie case has been made, but may also consider the record of conviction. As our Supreme Court explained, an examination of the record of conviction during the prima facie inquiry permits courts to distinguish "petitions with potential merit from those that are clearly meritless." (*People v. Lewis, supra,* 11 Cal.5th at p. 971.) Thus, the trial court did not err in considering whether the jury instructions and verdict conclusively negated the possibility that Caldera was found guilty of attempted murder on an imputed malice theory.

Caldera also argues that she may be entitled to relief under section 1172.6 even though the court did not give any instructions concerning the natural and probable consequences theory. She relies on language in section 1172.6 stating that relief is available for a defendant convicted under any "other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a).)

However, she does not acknowledge that this clause applies to felony murder and murder, not attempted murder. (*Ibid.*) Where, as in this case, the instructions did not permit the jury to convict appellant of "attempted murder under the natural and probable consequences doctrine" (*ibid.*), the plain language of section 1172.6 indicates that Caldera is ineligible for relief as a matter of law. (*Coley*, *supra*, 77 Cal.App.5th at p. 548 [defendant convicted of attempted murder not entitled to § 1172.6 relief because the jury was not instructed on the natural and probable consequences doctrine].)

Even assuming the language on which Caldera relies applies equally to murder and attempted murder, the record of conviction negates the possibility that Caldera was convicted of attempted murder based on a theory of imputed malice. The only theory on which Caldera's jury was instructed was direct aiding and abetting of attempted murder, which remains a valid theory of liability under section 1172.6. (*People v. Cortes* (2022) 75 Cal.App.5th 198, 204–205 [petitioner convicted of murder and attempted murder either as perpetrator or direct aider and abettor ineligible for § 1172.6 relief]; *Coley*, *supra*, 77 Cal.App.5th at p. 548 [same].)

The court instructed the jury with CALCRIM Nos. 400 and 401, which state that an aider and abettor's guilt is based on the direct perpetrator's acts *and* the aider and abettor's own acts and own mental state. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) CALCRIM No. 401 told the jury that to prove a defendant was guilty of a crime as an aider and abettor, the People had to prove, among other things, that Caldera knew that the perpetrator intended to commit the crime; intended to aid and abet the perpetrator in committing the crime; and in fact aided

17

and abetted the perpetrator's commission of the crime. The instruction further stated that Caldera, as an aider and abettor, must know "of the perpetrator's unlawful purpose" and specifically intend to "aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

CALCRIM No. 600 made clear that the People were required to prove that Caldera had the intent to kill. By convicting Caldera on the attempted murder charge, the jury necessarily found that she shared her codefendant's criminal purpose, and, with the intent of killing the victim, Caldera in fact aided, facilitated, promoted, encouraged, or instigated the commission of the attempted murder. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 [" 'the person guilty of attempted murder as an aider and abettor must intend to kill' "], quoting *People v. Lee* (2003) 31 Cal.4th 613, 624.) Further, CALCRIM No. 601 did not allow the jury to find the allegation true if the jury found someone other than Caldera intended to kill. In defining willfulness, deliberation, and premeditation, the trial court's instruction referred only to "the defendant." By finding Caldera acted willfully, deliberately, and with premeditation, the jury necessarily found Caldera acted with express malice. The jury therefore did not convict Caldera pursuant to a theory under which malice was merely imputed to her.

Caldera asserts that "the body of instructions considered as a whole, left room for doubt as to whether the jury would have necessarily been clear from a number of instructions allowing vicarious liability at several levels, that appellant Caldera herself had any intent to kill." Caldera relies on the fact that this was a gang case and "gang issues are inflammatory to jurors, who will tend to think of gang members as equally guilty of anything their

gang does."[4] Caldera does not cite any language in section 1172.6 or any decisions supporting that the presentation of gang evidence is sufficient to create an ambiguity as to whether intent was imputed to the defendant. The jury here was expressly instructed that gang evidence was introduced for a limited purpose and that it was not to conclude from the gang evidence that Caldera was a bad person or predisposed to commit crime. As stated, the instructions also required the jury to find that Caldera personally acted with an intent to kill to convict her of attempted murder as an aider and abettor. "We presume jurors understand and follow the instructions they are given, including the written instructions." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 431.)

Caldera further argues that "[i]mmediately after the instruction on an aider and abettor's intent to kill, came the instruction on this separate charge against the codefendant, for shooting into an occupied dwelling, with the codefendant's name

---

[4] Caldera cites Assembly Bill No. 333 (Stats. 2021, ch. 699, §§ 1–5), which provides for the bifurcation of gang enhancements, as support for this proposition. Setting aside that Assembly Bill No. 333 did not apply to this case, "nothing in Assembly Bill [No.] 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132; see also *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167–1168 [gang evidence is relevant and admissible when the motive is gang related; evidence related to gang membership not insulated from general rules applicable to relevant evidence].) Relying solely on the facts presented by Caldera, it would appear that gang evidence was relevant to the issues of Lerma's and Caldera's motive and intent. In any event, as we discuss, Caldera fails to establish that gang evidence is relevant to determining whether express malice has been imputed to her.

inserted in tiny, illegible handwriting, which could easily be overlooked." Caldera does not explain how this separate charge undermined the jury's findings that she personally acted with a willful, deliberate, and premeditated intent to kill. There is no basis to conclude it did.

Finally, Caldera asserts, without discussion of the jury instructions, "[a]s was the case in *Langi*, the record here leaves open the possibility that the jury convicted appellant on a theory of imputed malice, and therefore it does not *conclusively* establish that appellant was convicted under a still-valid theory of murder." Unlike the defendant in *Langi*, Caldera was convicted of attempted murder. In contrast to second degree implied malice murder, the perpetrator of an attempted murder must have the specific intent to unlawfully kill another human being. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 [" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' "].) As discussed above, the jury instructions correctly required the jury to find that Caldera, as an aider and abettor to attempted murder, shared the perpetrator's intent to kill before convicting her of attempted murder. Thus, the possibility of imputing malice to an aider and abettor identified in *Langi* was not present here. (See *Coley*, *supra*, 77 Cal.App.5th at pp. 547–548 [*Langi* is inapplicable where the attempted murder conviction is based on jury instructions requiring intent to kill].)

We agree with the trial court that the circumstances here are far more like those of *Coley*—where the defendant was convicted of attempted murder and the jury was likewise instructed with CALCRIM Nos. 400, 401, and 600 (*Coley*, *supra*, 77 Cal.App.5th at pp. 546–547)—than those of *Langi*. We

20

conclude the jury's verdict and the jury instructions show as a matter of law that Caldera was convicted as a direct aider and abettor, and therefore was convicted under a theory of attempted murder that remains valid.

## DISPOSITION

The order denying Caldera's section 1172.6 petition is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


ADAMS, J.